

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

GEORGE L. RIOSECO, EVA RIOSECO
and  NILDA CRUZ,
          Plaintiffs,

     vs.

GAMCO ASSET MANAGEMENT,  INC.,

         Defendant.

-------------------------------------------------------------- x



Case No.

**ECF Case**

JUDGE SEIBEL

09 CIV. 9396

## COMPLAINT

Plaintiffs, GEORGE RIOSECO, EVA RIOSECO and NILDA CRUZ, by and through their undersigned counsel, bring this action against Defendant GAMCO Asset Management, Inc. ("GAMCO"), an investment advisor registered with the United States Securities and Exchange Commission ("SEC"). In breach of its fiduciary duty to Plaintiffs, Defendant GAMCO placed Plaintiffs' investment accounts in highly risky securities in an effort to inflate its investment advisory fees without conducting even cursory due diligence on the investments. Defendant GAMCO also disregarded Plaintiffs' explicit instructions to place Plaintiffs' funds in safer investment vehicles, causing Plaintiffs significant financial harm. Plaintiffs bring this action to recover the significant losses they incurred in their investment portfolios as a result of the Defendant GAMCO's breach of fiduciary duty and other violations of law.

## PARTIES

1.      Plaintiff, George L. Rioseco, ("Rioseco"), is a 72 year-old semi-retired dentist who, at all relevant times, has lived at 4 Pheasant Drive, Rye, New York 10580. Rioseco invested funds with Gabelli & Company ("Gabelli & Co.") directly and through his Individual Retirement Account. GAMCO advised Rioseco with respect to the investments of these funds.

2.      Plaintiff Eva Rioseco ("Eva") is the wife of Rioseco who, at all relevant times, has also lived at 4 Pleasant Drive, Rye, New York 10580. Eva invested funds directly with Gabelli & Co. and Defendant GAMCO advised Eva with respect to the investment of these funds.

3.      Plaintiff Nilda Cruz ("Cruz") is the sister of Rioseco who, at all relevant times, lived at 7-03 154th Street, Beechhurst, New York 11357. Cruz invested funds directly with Gabelli & Co. and Defendant GAMCO advised Cruz with respect to the investment of these funds.

4.      Defendant GAMCO is a wholly owned subsidiary of GAMCO Investors, Inc. ("GAMCO Investors"). Defendant GAMCO is a New York investment advisory firm headquartered

at One Corporate Center, Rye, New York 10580 which, at all relevant times, according to Defendant

GAMCO, provided the investment advice to Plaintiffs with respect to their funds invested with

Gabelli & Co.  Defendant GAMCO claims that it is not a member of the Financial Industry

Regulatory Authority ("FINRA") and is, therefore, not subject to FINRA's jurisdiction for purposes

of arbitration.

## JURISDICTION & VENUE

5.      This Court has federal subject matter jurisdiction over this action under 28 U.S.C. §

1331, as Plaintiffs' claims under the Investment Advisors Act of 1940, 15 U.S.C. § 80b-6, arise

under federal law.   This Court has supplemental jurisdiction over Plaintiffs' remaining state law

claims under 28 U.S.C. § 1367 as such claims are so related to the federal claim as they form part of

the same case or controversy under Article III of the United States Constitution.  Venue is

appropriate in this District under 28 U.S.C. § 1391(a)(1) as a substantial part of the events giving rise

to the claim occurred at the corporate offices of Defendant GAMCO which are located in this

District.

## ENTITIES AFFILIATED WITH DEFENDANT GAMCO

6.      Gabelli & Co. a respondent in FINRA Arbitration No. 08-04965 brought by Plaintiff

Rioseco against the below-listed entities and individuals ("FINRA Arbitration"), is a wholly owned

subsidiary of GAMCO Investors.  Gabelli & Co. is a New York brokerage firm headquartered at One

Corporate Center, Rye, New York 10580 which, at all relevant times, managed Plaintiffs' accounts.

Gabelli & Co. was Plaintiffs' brokerage firm at all relevant times.

7.      GAMCO Investors, a respondent in the FINRA Arbitration, is a publicly traded

holding company headquartered at One Corporate Center, Rye, New York 10580.  At all relevant

times, GAMCO Investors has been a majority shareholder in Gabelli Securities, Inc., which, in turn,

has been a majority shareholder of Gabelli & Co.  GAMCO Investors, through its majority ownership of Gabelli Securities Inc., directs the management and policies of Gabelli & Co.

8.      John Gabelli  ("Gabelli"), a respondent in the FINRA Arbitration, is currently and has been since 1981 employed as a Senior Vice President of GAMCO.

9.      Daniel L. Lofrese, Jr. ("Lofrese"), a respondent in the FINRA Arbitration, is currently and has been since 2000 an employee of Gabelli & Co.  Lofrese is a securities broker.

10.     GAMCO Investors, Gabelli & Co., Gabelli and Lofrese are collectively referred to as the "FINRA Arbitration Respondents".

11.     Defendant GAMCO and the FINRA Arbitration Resdpodnents are all jointly and severally liable for the wrongdoing alleged herein. Counsel for Defendant GAMCO (who also serves as counsel for the FINRA Arbitration Respondents) represents that Defendant GAMCO is the liable party, because Defendant GAMCO placed the orders for Plaintiffs' accounts.  As previously alleged above, counsel for Defendant GAMCO also claims that Defendant GAMCO is not a member of FINRA, and is, therefore, not subject to FINRA's jurisdiction for purposes of arbitration.  Plaintiffs are pursuing claims against Defendant GAMCO, as well as the FINRA Arbitration Respondents, as all are jointly and severally lible to Plaintiffs for the wrongdoing alleged herein.

12.     In or about October 1984, Rioseco invested approximately $76,000 with Gabelli & Co.  Gabelli was assigned to manage Rioseco's accounts.

13.     At or about the same time, Eva invested money with Gabelli & Co.  Gabelli was assigned to manage Eva's accounts.

14.     In or about 1999, Cruz invested approximately $300,000 with Gabelli & Co.  Gabelli was assigned to manage Cruz's accounts.  At no time prior to Cruz's initial investment, nor indeed at

any time thereafter, did any representative of Defendant GAMCO discuss Cruz's financial situation or risk tolerance with her.

15.     In or about December 1996 and July 2000, Rioseco executed revised Investment Advisory Agreements with Defendant GAMCO. Copies of these documents are annexed hereto as Exhibits "A" and "B." Both of these agreements provided Defendant GAMCO with "complete and sole investment discretion and authority to manage" Rioseco's investment accounts. Defendant GAMCO identified itself in the 2000 agreement as "doing business under Gamco Asset Management Company, Inc."

16.     In or about July 2000, Eva executed a Revised Investment Advisory Agreement with Defendant GAMCO. This agreement provided Defendant GAMCO with "complete and sole investment discretion and authority to manage" Eva's investment account. Defendant GAMCO identified itself in the 2000 agreement as "during business under GAMCO Asset Management Company, Inc."

17.     On information and belief, Nilda Cruz executed an investment advisory agreement with Defendant GAMCO which provided Defendant GAMCO with complete and sole investment discretion and authority to manage her accounts.

18.     From 1984 to December of 2008, Rioseco continuously maintained investment accounts at Defendant GAMCO and Gabelli & Co. which were overseen by Gabelli, including an Individual Retirement Account. Over the years from 1984 until 2008, Rioseco grew to trust Gabelli's investment advice. Eva and Cruz also maintained their individual investment accounts at Defendant GAMCO and Gabelli & Co which were overseen by Gabelli. Defendant GAMCO handled Rioseco's accounts on a fully discretionary basis and, as such, owed Plaintiffs' fiduciary

duties o f utmost good faith, fair dealing, loyalty and candor.  The July 7, 2000 Investment Advisory

Agreement for the accounts state:

> GAMCO Authority.  GAMCO shall have complete and sole
> investment discretion and authority to manage the Account to the full
> extent permitted by law, including the purchase and sale of any
> securities, the weighting of investment positions within the portfolio,
> industry representation within the portfolio, the exercise of any and all
> voting rights pertaining to any securities held in the Account, and other
> relevant day to day investment decisions.

The agreements also provided that "GAMCO will establish a brokerage account through Gabelli &

Co., Inc. ("Gabelli and Company") with its clearing broker."

19.     By virtue of their corporate structure and relationships, and their course of conduct

over the years, Defendant GAMCO and the FINRA Arbitration Respondents exercised complete

investment discretion and authority over Plaintiffs' accounts.  As such, Defendant GAMCO and the

FINRA Arbitration Respondents were charged with fiduciary duties of utmost good faith, fair

dealing, candor and loyalty to Plaintiffs.  Defendant GAMCO and the FINRA Arbitration

Respondents are jointly and severally liable to Plaintiffs for the wrongdoing alleged herein.

## Summary of the Claims

20.     Plaintiffs have been long time customers of Defendant GAMCO.  Over the period

2002-2008, and with increasing frequency in 2008, Rioseco had sought financial advice and

guidance from Defendant GAMCO as to how to position Plaintiffs' accounts more conservatively, in

light of Plaintiffs' advancing age and that concomitant inability to earn substantial income in the

future.  Defendant GAMCO failed to heed Plaintiffs' repeated, and increasing, concerns, failed to

invest Plaintiffs' accounts more conservatively, failed to safeguard Plaintiffs' assets, and failed to

satisfy their ongoing suitability, fiduciary and other obligations to Plaintiffs.  As a result, Plaintiffs

have been substantially damaged.

### The Manhattan Partners Investment

21.     In or about 2002 (and numerous times thereafter), Rioseco advised Gabelli that, given Rioseco's advancing age, it was important to place more of his investment portfolio in safer investment vehicles.  Rioseco met with Gabelli at Gabelli's offices in Rye, New York to discuss how Rioseco's increasingly conservative investment objectives could be met.  At the meeting, Gabelli advised Rioseco that he should place a substantial portion of his retirement assets in a private investment fund which was organized as a limited partnership.  During the meeting, Gabelli stated that the limited partnership was a very safe investment and Rioseco should not expect to make the same type of return he was used to making in his regular account.  Gabelli also explained that the asset manager was ultimately Bernard Madoff ("Madoff") but that the money would go through a conduit (*i.e.*, Manhattan Partners B, L.P.  ("Manhattan Partners")) before it reached Madoff.  Gabelli explained that Madoff's trading strategy was safe and conservative because he did not maintain any positions at the end of the month; rather, he liquidated all of his assets and kept money in cash. Gabelli did not provide any further specifics on Madoff's trading strategy.  Rioseco initially declined to invest in Manhattan Partners, but Defendant GAMCO did not provide Rioseco with any other conservative recommendations, so Rioseco ultimately agreed to the investment.

22.     Based on the advice of Gabelli, Rioseco invested over $1 million, representing a substantial portion of his retirement assets, in Class B shares of Manhattan Partners.

23.     Gabelli and Robin Prever controlled the two General Partners of Manhattan Partners through two corporations, John Gabelli, Inc., a New York corporation, and Robin Prever, Inc., a Florida corporation.  Gabelli was at all times a majority shareholder with control over John Gabelli, Inc.

24.     The Manhattan Partners offering materials described that the Class B shares "will be invested with one of Manhattan Partner's investment managers." It also stated that "[t]he Class B shares are invested with a market neutral manager whose 10-year annual compounded rate of return is over 15%. Furthermore, <u>the manager has never had a down quarter or down year</u>." *See* Manhattan Partners I, L.P. Class B, Brief Summary of the Offering Memorandum, attached hereto as Exhibit "C."

## The S.W.A.N. Partners, L.L.P. Investment

25.     In or about January, 2008, in light of Rioseco's continued and ongoing concern over placing his assets in more conservative investment vehicles, which he repeatedly expressed to Defendant GAMCO, Gabelli advised Rioseco to invest in S.W.A.N. Partners, L.L.P. ("S.W.A.N."). "S.W.A.N." was an acronym for "Sleep Well At Night." SWAN is a New York limited partnership. The two general partners, Daniel L. Lofrese, Inc. and Carol A. Gabelli, Inc., are New York corporations controlled by their namesakes, who are both employees of Gabelli & Co. Lofrese was at all times a majority shareholder with control over Daniel L. Lofrese, Inc. Carol A. Gabelli, Gabelli's wife, was at all times a majority shareholder with control over Carol A. Gabelli, Inc.

26.     On or about January 28, 2008, on Gabelli's advice, Rioseco invested $200,000 of the assets in his retirement account in S.W.A.N.

27.     Gabelli also explained that the asset manager was ultimately Bernard Madoff, as with Manhattan Partners, but that the money would go through a conduit (S.W.A.N.) before it reached him. Gabelli reiterated that Madoff's trading strategy was safe.

28.     The S.W.A.N. partnership's objective was to: "Generate an above-average annual rate of return on invested capital, primarily through capital appreciation. Current income will be a secondary objective."

**Omissions and Misrepresentations Regarding Risks Inherent in Plaintiffs' Accounts**

29.     Defendant GAMCO never informed Rioseco of the inherent riskiness of concentrating such a large percentage of retirement assets with a single investment manager (Madoff).  Moreover, Defendant GAMCO abdicated its fiduciary responsibilities by allowing Madoff to exercise complete and unfettered discretionary authority over a substantial portion of Rioseco's retirement funds, without conducting adequate and appropriate due diligence into Madoff's investment strategy or the returns he claimed to provide.  Defendant GAMCO recklessly, with gross negligence, and in breach of its fiduciary obligations to Rioseco, caused a substantial portion of Plaintiff's retirement assets to be handed over to Madoff to be "invested" for the benefit of Rioseco.  Rioseco's accounts have been decimated as a direct result of Defendant GAMCO's abdication of their obligations to Rioseco, and the failure of Defendants to investigate numerous red flags indicating extreme risk to Rioseco from concentrating investment exposure in Madoff for a substantial portion of Rioseco's assets.

30.     Given Rioseco's age, his repeated expressed desire to place his retirement assets in safer investments, and his decreased ability to earn substantial income going forward, Defendant GAMCO had an affirmative obligation to ensure that Rioseco's account was properly invested, to keep informed regarding changes in the market, and to act to protect Rioseco's interests.  Moreover, given Rioseco's personal and financial situation and lack of experience investing in alternative investments, the Manhattan Partners and S.W.A.N. investments were unsuitable, as was the heavy concentration of the remainder of Rioseco's assets in equities, which exposed him to substantial market risk.

31.     Defendant GAMCO abrogated its fiduciary responsibilities to Rioseco by ceding to Madoff unfettered discretionary authority over Rioseco's account and allowing complete and

unfettered custody of Rioseco's funds to Madoff, with no specific oversight over Madoff or the manner in which he invested funds placed under his control.

32.     Defendant GAMCO never informed Rioseco of the inherent riskiness of concentrating such a large percentage of retirement assets with a single manager, including the risk that in the event of a regulatory or other legal problems at Madoff's firms, Rioseco could lose a substantial portion of his retirement assets.

33.     During the period from November 2007 through October 2008, Rioseco repeatedly expressed his growing concern over the state of his investment portfolio to Defendant GAMCO, seeking its advice as to how to more conservatively invest his assets.  At times, Defendant GAMCO simply failed to heed Rioseco's concerns.  At other times, Defendant GAMCO failed to return Rioseco's telephone calls and, on at least one occasion, Gabelli failed to show up for a scheduled meeting.  During the same period, the securities markets experienced severe volatility and declines. Yet, notwithstanding these market-wide issues, including the demise of Lehman Brothers, Bear Stearns, and many other firms, the widely-reported issues with AIG and other financial services firms, the federal bailout and growing unease in the economy and the capital markets, Defendant GAMCO failed to satisfy their ongoing suitability and other obligations to Rioseco, by failing to safeguard his assets.  The Manhattan Partners and S.W.A.N. Partners investments were unsuitable when made, and they became more and more unsuitable as time passed, while Rioseco grew older, his ability to earn substantial income in his dental practice decreased, and the capital markets grew more and more volatile and unstable.  Moreover, the overconcentration of Rioseco's assets in equities was blatantly unsuitable, given Rioseco's expressed desire to place his account in a more conservative posture.

**The Bernard Madoff Scandal**

34.     On December 10, 2008, Madoff reportedly informed certain senior employees at his investment firm Bernard L. Madoff Investment Securities, LLC ("BMIS") that his investment advisory business was a fraud.  Madoff reportedly stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." Madoff reportedly communicated to the senior employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors.  Madoff reportedly stated that the business was insolvent, and that it had been for years.  Madoff also reportedly stated that he estimated the losses from this fraud to be approximately $50 billion.

35.     On December 11, 2008, the SEC charged Madoff and BMIS with securities fraud for a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on advisory clients of BMIS. Also on December 11, 2008, Madoff and BMIS were criminally charged by the United States Attorney's Office of the Southern District of New York with securities fraud.  According to the SEC's complaint and the U.S. Attorney's criminal complaint, since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS.  The United States District Court for the Southern District of New York has appointed a receiver to oversee his firm BMIS.

36.     In the wake of this debacle, Rioseco contacted Gabelli concerning whether his limited partnership interests were presently invested in funds managed by Madoff.  Respondent Gabelli again acknowledged during these conversations that Rioseco's Manhattan Partners and S.W.A.N. Partners' assets were invested, through feeder vehicles, in funds managed by Madoff.  As a result, Rioseco reasonably believes that his investments in Manhattan Partners and S.W.A.N. Partners have been severely damaged, if not wiped out entirely.

37.     The recommendation to continue to concentrate such a large percentage of assets with Madoff is particularly egregious, given the number of growing red flags in the marketplace regarding Madoff and his investment strategy in recent years.  Indeed, many sophisticated fund managers refused to invest their clients' funds with Madoff because they, unlike Defendant GAMCO, conducted adequate due diligence into Madoff and his firm.  Prior to disclosure of the fraud, investment advisory firm Aksia concluded, among other things, that the stock holdings reported in the quarterly statements of BMIS filed with SEC appeared too small to support the size of the assets Madoff claimed to be managing.  Aksia sent a letter to its clients after the Madoff scandal broke stating that for years it had steered its clients away from Madoff:

- The Madoff feeder funds marketed a purported "Split-strike Conversion" strategy that is remarkably simple; however, its returns could not be nearly replicated by our quant analyst.

- It seemed implausible that the S&P 100 options market that Madoff purported to trade could handle the size of the combined feeder funds' assets which we estimated to be $13 billion.

- The feeder funds had recognized administrators and auditors but substantially all of the assets were custodied with Madoff Securities. This necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz (not a fictitious audit firm). After some investigating, we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff's activities.

- There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities. The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

- Madoff's website claimed that the firm was technologically advanced ("the clearing and settlement process is rooted in advanced technology") and the feeder managers claimed 100% transparency. But when we asked to see the transparency during our onsite visits, we were shown paper tickets that were sent via U.S. mail daily to the managers. The managers had no demonstrated electronic access to their funds accounts at Madoff. Paper copies provide a hedge fund manager with the end of the day ability to manufacture trade tickets that confirm the investment results.

- Conversations with former employees indicated a high degree of secrecy surrounding the trading of these feeder fund accounts. Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm. Aksia is consistently negative on firms where key and control positions are held by family members.

- Madoff Securities, through discretionary brokerage agreements, initiated trades in the accounts, executed the trades, and custodied and administered the assets. This seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags.

The Aksia letter is annexed hereto as Exhibit "D."

38.   Similarly, on December 18, 2008, *The Wall Street Journal* reported that certain

investment firms throughout Wall Street were convinced as early as 2005 that Madoff's firm was a

fraud, even going so far as to call it a ponzi scheme.  In a letter dated November 7, 2005 from Harry

Markopolos to the Securities and Exchange Commission, the SEC was advised of the suspicions of

Markopolos (and others on Wall Street) that Madoff was a fraud.  This letter (which is annexed

hereto as Exhibit "E") states:

> I am the original source of the information presented herein having first presented my rationale, both verbally and in writing, to the SEC's Boston office in May, 1999 before any public information doubting Madoff Investment Securities, LLC appeared in the press.  There was no whistleblower or insider involved in compiling this report.  I used the Mosaic Theory to assemble my set of observations.  My observations were collected first-hand by listening to fund of fund investors talk about their investments in a hedge fund run by Madoff

Investment Securities, LLC, a SEC registered firm. I have also spoken to the heads of various Wall Street equity derivative trading desks and every single one of the senior managers I spoke with told me that Bernie Madoff was a fraud.

\*      \*      \*

I have outlined a detailed set of Red Flags that made me very suspicious that Bernie Madoff's returns aren't real and, if they are real, then they would almost certainly have to be generated by front-running customer order flow from the broker-dealer arm of Madoff Investment Securities, LLC.

\*      \*      \*

Scenario #2 **(Highly likely)** Madoff Securities is the world's largest Ponzi Scheme. In this case there is no SEC reward payment due the whistle-blower so basically I'm turning this case in because it's the right thing to do. Far better that the SEC is proactive in shutting down a Ponzi Scheme of this size rather than reactive.

39.     The letter goes on to identify numerous red flags, from publicly available information, that Madoff was engaged in fraud, including questions concerning:

- the unusual manner in which Madoff structured his business operations;

- the fact that Madoff's firms were funding their operations at extremely high interest rates when cheaper money was available in short term credit markets;

- the fact that Madoff operated his firm with an extraordinary level of secrecy;

- Madoff's strategy could not possibly deliver the returns Madoff was boasting;

- The counter-party credit exposure necessary to support Madoff's alleged strategy would be too large for UBS and Merrill Lynch to handle; and

- In addition to discussions Markopolos had with various Wall Street equity derivative traders (all of whom believed Madoff was a fraud), certain press articles doubted the validity of Madoff's returns.

40.     Robert Rosenkranz, the principal of a major investment advisor to wealthy clients, Acorn Partners, was reported in the financial press to have stated that his firm's earlier due diligence of the Madoff firm, based in part on the abnormally stable and high investment returns claimed by

Madoff and in part on inconsistencies between customer account statements and audited BMIS financial statements filed with the SEC, caused Acorn to conclude that it was highly likely that the BMIS account statements were generated as part of a fraudulent scheme.

41.     Defendant GAMCO abdicated responsibility of the management of a substantial portion of Rioseco's assets to Madoff, and recklessly, with gross negligence and in breach of their fiduciary obligations, failed to perform or cause to be performed appropriate due diligence that would have revealed material irregularities in the investments, operations and financial reporting of Madoff and his firms.

42.     Defendant GAMCO either knew of or recklessly disregarded: (a) the very high concentration of Rioseco's investments in a single third party investment manager, and the materially heightened risk to Rioseco's assets from such reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (b) the abnormally high and stable positive investment results reportedly obtained by Madoff; (c) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients; and (d) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County New York and had no experience auditing entities of the apparent size and complexity of BMIS.

### The Improper and Unauthorized Investments in Late 2007

43.     In late 2007, Rioseco continued to be nervous about the general market conditions and sought guidance from Defendants as to how to protect his assets.  Rioseco called Gabelli to instruct him to keep a portion of his position in cash.  Gabelli was unavailable at the moment, and Rioseco gave his instructions to Lofrese, Gabelli's associate.  At the time, there was approximately $700,000 in cash in Rioseco's accounts.

44.    In direct contradiction to Rioseco's express instructions, Defendant GAMCO invested a substantial portion of the approximately $700,000 in cash and Rioseco sustained substantial losses on those unauthorized investments. When Rioseco received his January 2008 monthly account statement following that conversation, he realized that GAMCO has acted contrary to his instructions and he called Lofrese.  During this conversation, Lofrese told Rioseco that he "forgot" to pass along the instructions to trading personnel at GAMCO.  Lofrese never did as the cash in Rioseco's IRA dwindled from $696,000 as of November 30, 2007 to $99,000 as of May 31, 2008.

### Other Improprieties

45.    Defendants further failed to discharge their continuing and ongoing duties to ensure that Plaintiffs' investments were appropriate and suitable.  For example, from the period of December 31, 2007 until October 31, 2008, Rioseco's retirement account value (excluding his investments in Manhattan Partners and SWAN Partners) diminished from more than $3.8 million to less than $2.2 million, or approximately 43%.  Further, during the same period, Eva's investment portfolio diminished from more than $770,000 to less than $372,000, after netting at $145,000 in distributions, Eva's portfolio declined approximately 41%.  Cruz, an elderly widower, received approximately $325,000 from her husband's estate in 1999.  Since the end of 2007, she has lost a significant amount of that money in investments that, upon information and belief, were almost entirely weighted in risky equity investments.  Given the serious adverse market conditions present in late 2007 and into 2008, a prudent investment advisor would have reduced the risks in Plaintiffs' portfolios.  In the face of such conditions, Defendant GAMCO failed to take reasonable steps to protect Plaintiffs against the adverse consequences of the market downturn.

46.    For example, as of December 31, 2007, Defendant GAMCO advised Rioseco to invest his retirement assets in $3,014,367.09 of stocks (98.78% of the non-limited partnership

investments in the account) and only $37,062.50 of fixed income vehicles (1.21% of the non-limited partnership investments in the account). *See* December 31, 2007 IRA Account Statement attached hereto as Exhibit "F". As the market continued to deteriorate in 2008, this ratio became even worse. As of May 31, 2008, Defendant GAMCO advised Rioseco to invest his retirement assets in $3,090430.66 of stocks (98.95% of the non-limited partnership investments in the account) and only $32,875 (1.05% of the non-limited partnership investments in the account) of fixed income instruments. *See* May 31, 2008 IRA Account Statement annexed hereto as Exhibit "G". As a result, Rioseco remained exposed to substantial market risk, despite repeatedly expressing to Defendant GAMCO his growing concerns about risk and his desire to have his assets invested more conservatively.

47.      Defendant GAMCO also failed to properly protect and safeguard Rioseco's non-retirement investment account. As of January 31, 2008, Defendant GAMCO had 96.6% of Defendant GAMCO investment account invested in stocks and 3.34% in cash. *See* January 31 Investment Account Statement attached hereto as Exhibit "H". Defendant GAMCO failed to take steps to protect these assets while the markets continued to decline in 2008. As of August 31, 2008, Defendants had 96.79% of Rioseco's total assets in stocks and 3.21% in cash. *See* August 31, 2008 Investment Account Statement attached hereto as Exhibit "I".

48.      During the period December 31, 2007 until at least October 1, 2008, Defendant GAMCO invested Plaintiffs' accounts heavily in stocks with almost no weighting in safer investments such as bonds, low-yield CDs or money market funds. Not only should Defendant GAMCO have known that Rioseco, at age 72, his wife Eva, age 74, and his sister, Cruz, a 62-year old widow with little earning power and limited assets, should have been invested in less risky instruments, Defendant GAMCO was on specific notice that Rioseco and Eva wanted to begin to

cycle out of equities into more conservative investments, given the repeated concerns Rioseco expressed over his and his wife's portfolio, beginning in 2002, and escalating substantially in late 2007 into 2008.

49.     In January 2009, after receiving her statement, Cruz called Lofrese to ask why her account had lost so much money.  After Cruz reminded him, in tears, that her inheritance was necessary to supplement her living expenses, she asked him what she should do about the precipitous losses in her accounts.  Lofrese, in a stunning recognition of his lack of regard for his fiduciary responsibilities, told her to get a financial advisor.

50.     As a direct consequence of Defendant GAMCO's failure to invest Plaintiffs' assets in suitable investments, Plaintiffs incurred substantial losses.


## CAUSES OF ACTION

### Count I - Breach of Investment Advisors Act - 15 U.S.C. § 80b-6

51.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

52.     Plaintiffs entered into investment advisory contracts with Defendant GAMCO.

53.     Defendant GAMCO engaged in transactions, practices and a course of business that operated as a fraud and deceit on Plaintiffs and which is considered manipulative.  Further, by virtue of its investment of Rioseco's funds in Manhattan Partners and S.W.A.N., GAMCO failed to discharge its duty that its investment advise be disinterested.  GAMCO principals and Gabelli and Lofrese had, at all relevant times, interest in Manhattan Partners and S.W.A.N.

54.     Defendant GAMCO used the United States mail in connection with its course of business with Plaintiffs.

55.     Under Section 215 of the IAA, as a result of the violations of the IAA, Plaintiffs are entitled to rescind their investment advisory contracts with Defendant GAMCO and restitution of all monies they paid to Defendant GAMCO as investment advisory fees.

## Count II – Breach of Fiduciary Duty

56.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

57.     By virtue of their discretionary authority over Plaintiffs' accounts, Defendant GAMCO owes continuing fiduciary duties of care, loyalty, candor and good faith directly to Plaintiffs.  Defendant GAMCO has breached those fiduciary duties in the manner set forth herein.

58.     Defendant GAMCO intentionally or acting with gross negligence and recklessness, and contrary to industry customs, practices and standards, failed to comply with their fiduciary duties by:

(a)     failing to conduct adequate due diligence into the sub-advisor handling Plaintiffs' assets;

(b)     failing to uncover and/or alert Plaintiffs to the numerous red flags which Defendant GAMCO should have discovered about the sub-advisor handling Plaintiffs' assets;

(c)     failing to protect and safeguard Plaintiffs' assets by allowing the funds to be custodied with Madoff, despite the clear conflicts of interest involved in that arrangement;

(d)     failing to protect and safeguard Plaintiffs' funds by allowing the funds to be over-exposed to declines in the market and failing to place the accounts in a defensive posture even after Rioseco expressed his continued uneasiness over the markets in 2007 and 2008;

(e)     trading Plaintiffs' accounts in total disregard of his investment objectives, financial limitations, and his

specific authorizations and instructions, and
misrepresentations or omissions relating thereto; and

(f)    initiating an overall strategy without reasonable grounds
to expect achievement of Plaintiffs' investment
objectives and by failing to reveal the risks inherent in
such transactions and strategies, and misrepresentations
or omissions relating thereto.

59.    By virtue of the above, Defendant GAMCO breached its fiduciary and other legal

duties to provide competent, professional services according to rules and regulations of FINRA and

industry customs, practices and standards, and duties of good faith and fair dealing owed to

Plaintiffs.

60.    By virtue of the foregoing, Plaintiffs have been damaged and are entitled to recover

from Defendant GAMCO an amount to be proved at the hearing of this matter representing the

damages incurred as a result of the activity complained of above.

### <u>Count III – Unsuitability of Investments</u>

61.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as

if fully set forth herein.

62.    The unsuitability doctrine provides, in pertinent part:

(a)    In recommending to a customer the purchase, sale or
exchange of any security, a member shall have
reasonable grounds for believing that the
recommendation is suitable for such customer upon the
basis of the facts, if any, disclosed by such customer as
to his other security holdings and as to his financial
situation and needs.

(b)    Prior to the execution of a transaction recommended to
a non-institutional customer, other than transactions
with customers where investments are limited to money
market mutual funds, a member shall make reasonable
efforts to obtain information concerning:

(1)    the customer's financial status;

    (2)    the customer's tax status;

    (3)    the customer's investment objectives; and

    (4)    such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer

63.    Defendant GAMCO invested Plaintiffs' assets in unsuitable investment vehicles, failed to conduct adequate due diligence on the sub-advisor, Madoff, and failed to protect and safeguard the portfolio from the possibility of severe market declines.  This Rule prohibits brokers from making investment recommendations that are unsuitable to their clients' investment objectives, financial situation and risk tolerance.  In determining suitability, the broker should not only investigate the individual securities recommended in light of the client's investment experience, level of sophistication, investment objectives, financial situation, and tolerance for risk, but should also take into account the overall trading strategy employed by the broker in the handling of the account in light of these considerations as well.

64.    Moreover, suitability is an ongoing and continuing obligation of the broker, and as a client's situation and risk tolerance changes over time, the broker is obligated to constantly review the suitability of a customer's investments, and to take affirmative steps to respond to a client's situation and protect a client's assets.

65.    By virtue of the foregoing, Plaintiffs have been damaged and is entitled to recover from Defendants an amount to be proved at the hearing of this matter representing the damages incurred as a result of the activity complained of above.

## Count IV - Common Law Fraud

66.    Plaintiff Rioseco repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

67.    Defendant GAMCO recklessly failed to appreciate that the limited partnership investments managed by Madoff were risky investments which were not suitable for Plaintiff Rioseco, and recklessly failed to conduct adequate due diligence on Madoff and his firms. Defendants recklessly failed to keep Plaintiff apprised of increasing risks in his investment portfolio.

68.    Defendant GAMCO has misrepresented to Plaintiff Rioseco the true nature of the limited partnership investments they sold to Plaintiff Rioseco.  Defendant GAMCO represented that the limited partnership investments were safe investments, but Defendant GAMCO failed to disclose the risks inherent in overconcentrating Plaintiff Rioseco's retirement assets with Madoff, as described herein.  Defendant GAMCO also failed to disclose that they failed to conduct adequate and appropriate due diligence on Madoff and his operations.

69.    Those representations were materially false in that the investments were much riskier than Defendant GAMCO portrayed them to be, as described herein.

70.    Plaintiff Rioseco reasonably relied upon the veracity of Defendant GAMCO regarding the limited partnership investments.

71.    By virtue of the foregoing, Plaintiff Rioseco has been damaged and is entitled to recover from Defendant GAMCO an amount to be proved at the hearing of this matter representing the damages incurred as a result of the activity complained of above.

## Count V – Negligence and Gross Negligence

72.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

73.     By virtue of the foregoing, Defendant GAMCO breached its duty to exercise reasonable care, competence and diligence in the management of Plaintiffs' accounts and to act in a manner consistent with industry customs, practice and standards.

74.     As a direct and proximate result of the negligence and gross negligence of Defendant GAMCO, Plaintiffs suffered significant monetary loss.

75.     By virtue of the foregoing, Plaintiffs have been damaged and are entitled to recover from Defendant GAMCO an amount to be proved at the hearing of this matter representing the damages incurred as a result of the activity complained of above.

## Count VI – Breach of Contract

76.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

77.     By virtue of the above, Defendant GAMCO has breached an express and/or implied contract with Plaintiffs with respect to their accounts and transactions for said accounts and, upon information and belief, in failing to abide by industry standards of conduct, express and implied, including but not limited to Defendant GAMCO's own written supervisory procedures, practices and procedures, and in-house compliance manual.

78.     By virtue of the above, Plaintiffs have been damaged and are entitled to recover of Defendant GAMCO an amount to be proved at the hearing of their matter representing the realized trading losses incurred as a result of the activity complained of above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant GAMCO as follows:

(a)   rescission of their investment advisory contracts and restitution of all monies paid as investment advisor fees;

(b)   rescissory or compensatory damages for the out-of-pocket losses suffered in an amount to be established at trial;

(c)   consequential damages, in an amount to be proven at trial;

(d)   punitive damages to punish Defendant GAMCO for its willful misconduct and flagrant violations of their obligations to Plaintiffs, so as to set an example and to deter such behavior in the future;

(e)   the costs of litigation, including reasonable consulting and representation fees, expert witness fees and any other costs deemed reasonable; and

(f)   any other damages or other relief deemed just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.

Dated: November 12, 2009

LOWEY DANNENBERG COHEN & HART, P.C.

By: _____

Peter D. St. Phillip, Jr. (PS-0726)
Thomas M. Skelton (TS-7908)
White Plains Plaza
One North Broadway, Suite 509
White Plains, New York 10601
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035