# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                                             :
GEORGE L. RIOSECO, EVA RIOSECO                               :        Honorable Cathy Seibel
and  NILDA CRUZ, individually and on behalf                  :
of a class of similarly situated individuals and             :        Case No. 7:09-cv-9396
entities,                                                    :
              Plaintiffs,                                     :        ECF Case
                                                             :
                                                             :
           vs.                                               :
                                                             :
GAMCO ASSET MANAGEMENT,  INC.,                               :
                                                             :
              Defendant.                                      :
                                                             :
-------------------------------------------------------------x
```

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, GEORGE RIOSECO, EVA RIOSECO and NILDA CRUZ, on behalf of themselves and similarly situated individuals and entities, by and through their undersigned counsel, bring this action against Defendant GAMCO Asset Management, Inc. ("GAMCO"), an investment advisor registered with the United States Securities and Exchange Commission ("SEC").  In breach of its fiduciary duty to Plaintiffs, Defendant GAMCO placed Plaintiffs' investment accounts in highly risky securities in an effort to inflate its investment advisory fees without conducting even cursory due diligence on the investments.  GAMCO also disregarded Plaintiffs' explicit instructions to place Plaintiffs' funds in safer investment vehicles, causing Plaintiffs significant financial harm.  Plaintiffs bring this action: (1) on behalf of themselves and similarly situated investment advisory clients of GAMCO to rescind their investment advisory contracts and for restitution of the investment advisory fees paid to GAMCO; and (2) individually to recover the significant losses they incurred in their investment portfolios as a result of the Defendant GAMCO's breach of fiduciary duty and other violations of law.

## PARTIES

1.      Plaintiff, George L. Rioseco, ("Rioseco"), is a 72 year-old semi-retired dentist who, at all relevant times, has lived at 4 Pheasant Drive, Rye, New York 10580.  Rioseco invested funds with Gabelli & Company ("Gabelli & Co.") directly and through his Individual Retirement Account.  GAMCO advised Rioseco with respect to the investments of these funds.  Rioseco had continuously been an investment advisory client of GAMCO from 1985 until 2009.

2.      Plaintiff Eva Rioseco ("Eva") is the wife of Rioseco who, at all relevant times, has also lived at 4 Pleasant Drive, Rye, New York 10580.  Eva invested funds directly with Gabelli & Co. and Defendant GAMCO advised Eva with respect to the investment of these funds.

3.     Plaintiff Nilda Cruz ("Cruz") is the sister of Rioseco who, at all relevant times, lived at 7-03 154th Street, Beechhurst, New York 11357.  Cruz invested funds directly with Gabelli & Co. and Defendant GAMCO advised Cruz with respect to the investment of these funds.

4.     Defendant GAMCO is a wholly owned subsidiary of GAMCO Investors, Inc. ("GAMCO Investors").  Defendant GAMCO is a New York investment advisory firm headquartered at One Corporate Center, Rye, New York 10580 which, at all relevant times, according to Defendant GAMCO, provided the investment advice to Plaintiffs with respect to their funds invested with Gabelli & Co.  Defendant GAMCO claims that it is not a member of the Financial Industry Regulatory Authority ("FINRA") and is, therefore, not subject to FINRA's jurisdiction for purposes of arbitration.

## JURISDICTION & VENUE

5.     This Court has federal subject matter jurisdiction over this action under 28 U.S.C. § 1331, as Plaintiffs' claims under the Investment Advisors Act of 1940, 15 U.S.C. § 80b-6, arise under federal law.   This Court has supplemental jurisdiction over Plaintiffs' remaining state law claims under 28 U.S.C. § 1367 as such claims are so related to the federal claim as they form part of the same case or controversy under Article III of the United States Constitution.  Venue is appropriate in this District under 28 U.S.C. § 1391(a)(1) as a substantial part of the events giving rise to the claim occurred at the corporate offices of Defendant GAMCO which are located in this District.

## ENTITIES AND INDIVIDUALS AFFILIATED WITH DEFENDANT GAMCO

6.     Gabelli & Co. is a wholly owned subsidiary of GAMCO Investors.  Gabelli & Co. is a New York brokerage firm headquartered at One Corporate Center, Rye, New York 10580 which, at all relevant times, managed Plaintiffs' accounts.  Gabelli & Co. was Plaintiffs' brokerage firm at all relevant times.

7.      GAMCO Investors is a publicly traded holding company headquartered at One Corporate Center, Rye, New York 10580.  At all relevant times, GAMCO Investors has been a majority shareholder in Gabelli Securities, Inc., which, in turn, has been a majority shareholder of Gabelli & Co.  GAMCO Investors, through its majority ownership of Gabelli Securities Inc., directs the management and policies of Gabelli & Co.

8.      John Gabelli  ("Gabelli"), is currently and has been since 1981 employed as a Senior Vice President of GAMCO.   Gabelli is also the sole shareholder of John Gabelli, Inc., a company which was established solely for the purpose of serving as a General Partner to certain limited partnerships which Gabelli marketed to GAMCO clients.

9.      Daniel L. Lofrese, Jr. ("Lofrese"), is currently and has been since 2000 an employee of GAMCO.  Mr. Lofrese has, at all relevant times, worked closely with Gabelli at GAMCO. Lofrese is also the sole shareholder of Daniel L. Lofrese, Inc., a company which was established solely for the purposes of serving as a General Partner for a limited partnership which Lofrese marketed to GAMCO clients.

10.     Manhattan Partners, L.P. ("Manhattan Partners") is a Delaware limited partnership. The General Partners of Manhattan Partners are John Gabelli, Inc. and Robin Prever, Inc. Substantial sums of Manhattan Partners have, at all relevant times, been invested in limited partnerships controlled by Sandra Manzke, a Darien, Connecticut-based hedge fund manager, including, most recently, Maxam Absolute Return Fund, L.P.  Ms. Manzke's funds invested, in turn, in Bernard Madoff's securities firm.

11.     S.W.A.N. Partners, L.L.C. ("S.W.A.N.") is a New York limited partnership. "S.W.A.N." is an acronym for "Sleep Well At Night."   The General Partners of S.W.A.N. are Daniel L. Lofrese and Carol Gabelli, Inc.  Like Manhattan Partners, substantial sums of S.W.A.N.

have, at all relevant times, been invested in limited partnerships controlled by Sandra Manzke which, in turn, were turned over to Bernard Madoff's securities firm for him to invest.

## PLAINTIFFS' INVESTMENTS WITH DEFENDANT

12.    In or about October 1984, Rioseco invested approximately $76,000 with Gabelli & Co.  Gabelli was assigned to manage Rioseco's accounts.

13.    At or about the same time, Eva invested money with Gabelli & Co.  Gabelli was assigned to manage Eva's accounts.

14.    In or about 1999, Cruz invested approximately $300,000 with Gabelli & Co.  Gabelli was assigned to manage Cruz's accounts.  At no time prior to Cruz's initial investment, nor indeed at any time thereafter, did any representative of Defendant GAMCO discuss Cruz's financial situation or risk tolerance with her.

15.    At various times since 1985, including in or about December 1996 and July 2000, Rioseco executed investment advisory agreements with Defendant GAMCO.  These agreements provided Defendant GAMCO with "complete and sole investment discretion and authority to manage" Rioseco's investment accounts.  Defendant GAMCO identified itself in the 2000 agreement as "doing business under Gamco Asset Management Company, Inc."

16.    In or about July 2000, Eva executed a Revised Investment Advisory Agreement with Defendant GAMCO.  This agreement provided Defendant GAMCO with "complete and sole investment discretion and authority to manage" Eva's investment account.  Defendant GAMCO identified itself in the 2000 agreement as "during business under GAMCO Asset Management Company, Inc."

17.    On information and belief, Nilda Cruz executed an investment advisory agreement with Defendant GAMCO which provided Defendant GAMCO with complete and sole investment discretion and authority to manage her accounts.

18.     From 1984 to December of 2008, Rioseco continuously maintained investment accounts at Defendant GAMCO and Gabelli & Co. which were overseen by Gabelli, including an Individual Retirement Account.  Over the years from 1984 until 2008, Rioseco grew to trust Gabelli's investment advice.  Eva and Cruz also maintained their individual investment accounts at Defendant GAMCO and Gabelli & Co which were overseen by Gabelli.  Defendant GAMCO handled Rioseco's accounts on a fully discretionary basis and, as such, owed Plaintiffs' fiduciary duties of utmost good faith, fair dealing, loyalty and candor.  The July 7, 2000 Investment Advisory Agreement for the accounts state:

> GAMCO Authority.  GAMCO shall have complete and sole investment discretion and authority to manage the Account to the full extent permitted by law, including the purchase and sale of any securities, the weighting of investment positions within the portfolio, industry representation within the portfolio, the exercise of any and all voting rights pertaining to any securities held in the Account, and other relevant day to day investment decisions.

The agreements also provided that "GAMCO will establish a brokerage account through Gabelli & Co., Inc. ("Gabelli and Company") with its clearing broker."

19.     Defendant GAMCO exercised complete investment discretion and authority over Plaintiffs' accounts.  As such, Defendant GAMCO were charged with fiduciary duties of utmost good faith, fair dealing, candor and loyalty to Plaintiffs.

## SUMMARY OF THE CLAIMS

20.     Plaintiffs have been long time customers of Defendant GAMCO.  Over the period 2002-2008, and with increasing frequency in 2008, Rioseco had sought financial advice and guidance from Defendant GAMCO as to how to position Plaintiffs' accounts more conservatively, in light of Plaintiffs' advancing age and that concomitant inability to earn substantial income in the future.  Defendant GAMCO failed to heed Plaintiffs' repeated, and increasing, concerns, failed to

invest Plaintiffs' accounts more conservatively, failed to safeguard Plaintiffs' assets, and failed to satisfy their ongoing suitability, fiduciary and other obligations to Plaintiffs.  As a result, Plaintiffs have been substantially damaged.  GAMCO also provided Plaintiffs and all of its investment advisory clients that invested in limited partnerships that were ultimately managed by Bernard Madoff false and misleading information about the nature of their investments and the amount of due diligence it had conducted in connection with these investments.  As a result, Plaintiffs and the absent members of the Class (as plead herein) seek rescission of their investment advisory agreements and return of all fees Defendant charged them under the Investment Company Act.

## THE MANHATTAN PARTNERS INVESTMENT

21.     In or about 2002 (and numerous times thereafter), Rioseco advised Gabelli that, given Rioseco's advancing age, it was important to place more of his investment portfolio in safer investment vehicles.  Rioseco met with Gabelli at Gabelli's offices in Rye, New York to discuss how Rioseco's increasingly conservative investment objectives could be met.  At the meeting, Gabelli advised Rioseco that he should place a substantial portion of his retirement assets in a private investment fund which was organized as a limited partnership.  During the meeting, Gabelli stated that the limited partnership was a very safe investment and Rioseco should not expect to make the same type of return he was used to making in his regular account.  Gabelli also explained that the asset manager was ultimately Bernard Madoff ("Madoff") but that the money would go through a conduit (*i.e.*, Manhattan Partners B, L.P.  ("Manhattan Partners")) before it reached Madoff.  Gabelli explained that Madoff's trading strategy was safe and conservative because he did not maintain any positions at the end of the month; rather, he liquidated all of his assets and kept money in cash.  Gabelli did not provide any further specifics on Madoff's trading strategy.  Rioseco initially declined to invest in Manhattan Partners, but Defendant GAMCO did not provide Rioseco with any other conservative recommendations, so Rioseco ultimately agreed to the investment.

22.    Based on the advice of Gabelli, Rioseco invested over $1 million, representing a substantial portion of his retirement assets, in Class B shares of Manhattan Partners.

23.    Gabelli and Robin Prever controlled the two General Partners of Manhattan Partners through two corporations, John Gabelli, Inc., a New York corporation, and Robin Prever, Inc., a Florida corporation.  Gabelli and Prever were the only shareholders of John Gabelli, Inc. and Robin Prever, Inc., respectively.  These corporations were established for the sole purpose of attempting to limit the personal liability of Gabelli and Prever and are nothing more than shell corporations that conduct no real business.

24.    The Manhattan Partners offering materials described that the Class B shares "will be invested with one of Manhattan Partner's investment managers."  It also stated that "[t]he Class B shares are invested with a market neutral manager whose 10-year annual compounded rate of return is over 15%.  Furthermore, the manager has never had a down quarter or down year."   These statements were materially misleading and were based on no diligence whatsoever.  John Gabelli only spoke with Bernard Madoff once to ask if he could invest with him directly and Mr. Madoff told him that his fund was not accepting any additional direct investments.  Neither John Gabelli nor any other representative of GAMCO ever had access to any of Mr. Madoff's trading operations.  Neither Gabelli nor anyone else at GAMCO ever did any due diligence whatsoever of Mr. Madoff's investments.

25.    In or about September 2006, Gabelli was told by his assistant Lofrese that Barron's had reported in May 2001 that:

> ...some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone.  The recent MAR Hedge report, for example, cited more than a dozen hedge fund professionals, including current and former Madoff traders, who questioned why no one had been able to duplicate Madoff's returns using this strategy.  Likewise, three option strategists at major investment banks told Barron's they couldn't understand how Madoff

churns out such numbers.  Adds a former Madoff investor: "Anyone who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story.  To take it at face value is a bit naive.

26.     On September 14, 2006, Lofrese e-mailed this article to Jim Webster, another account manager at GAMCO.  After discussing the article with Lofrese, Gabelli himself was sufficiently worried by this skepticism to call Joseph Soares, Manhattan Partners' account manager at Maxam Capital Management, LLC, the investment advisor for Maxam Absolute Return Fund, L.P., the limited partnership which Manhattan Partners and S.W.A.N. invested its money which was then invested into Bernard Madoff's firm.  After having this one conversation with Mr. Soares, Gabelli was satisfied that Manhattan Partners' investment with Mr. Madoff's firm was secure, simply on the word of another individual who had no access to Mr. Madoff's operations.  John Gabelli, however, took no steps to inform his asset management clients whose funds were supposedly invested with Mr. Madoff of (1) the Barron's article; (2) the conversation that he had with Mr. Soares; or (3) the lack of due diligence he conducted of Mr. Madoff's operations.  This lack of disclosure violated the fiduciary duty imposed upon investment advisors under Section 206 of the IAA which requires an affirmative obligation of utmost good faith and full and fair disclosure of all material facts to an investment adviser's clients.

**THE S.W.A.N. INVESTMENT**

27.     In or about January, 2008, in light of Rioseco's continued and ongoing concern over placing his assets in more conservative investment vehicles, which he repeatedly expressed to Defendant GAMCO, Gabelli advised Rioseco to invest in S.W.A.N.  "S.W.A.N." was an acronym for "Sleep Well At Night."  SWAN is a New York limited partnership.  The two general partners, Daniel Lofrese, Inc. and Carol A. Gabelli, Inc., are New York corporations controlled by their namesakes, who are both employees of Gabelli & Co.  Lofrese and Carol Gabelli were the only

shareholders, officers and directors of Daniel Lofrese, Inc. and Carol A. Gabelli, Inc. respectively. These corporations were established for the sole purpose of attempting to limit the personal liability of Mr. Lofrese and Mrs. Gabelli and are nothing more than shell corporations that conduct no real business. Carol A. Gabelli, Gabelli's wife, had and has no investment experience whatsoever and was entirely unqualified to manage S.W.A.N.  Internal e-mails at GAMCO confirm that Lofrese and Gabelli actively recruited Rioseco to move his Manhattan Partners investment into S.W.A.N. so as to increase the amount of fees they could share as individuals exercising complete control over the S.W.A.N. general partners as opposed to Manhattan Partners, where the general partners included Robin Prever's company.

28.     On or about January 28, 2008, on Gabelli's advice, Rioseco invested $200,000 of the assets in his retirement account in S.W.A.N.

29.     Gabelli also explained that the asset manager was ultimately Bernard Madoff, as with Manhattan Partners, but that the money would go through a conduit (S.W.A.N.) before it reached him.  Gabelli reiterated that Madoff's trading strategy was safe.

30.     The S.W.A.N. partnership's objective was to:  "Generate an above-average annual rate of return on invested capital, primarily through capital appreciation.  Current income will be a secondary objective."  This was a materially misleading statement that turned out to be untrue.

### OMISSIONS AND MISREPRESENTATIONS REGARDING RISKS INHERENT IN PLAINTIFFS' ACCOUNTS

31.     Defendant GAMCO never informed Rioseco of the inherent riskiness of concentrating such a large percentage of retirement assets with a single investment manager (Madoff).  Moreover, Defendant GAMCO abdicated its fiduciary responsibilities by allowing Madoff to exercise complete and unfettered discretionary authority over a substantial portion of Rioseco's retirement funds, without conducting adequate and appropriate due diligence into

Madoff's investment strategy or the returns he claimed to provide.  Defendant GAMCO recklessly, with gross negligence, and in breach of its fiduciary obligations to Rioseco, caused a substantial portion of Plaintiff's retirement assets to be handed over to Madoff to be "invested" for the benefit of Rioseco.  Rioseco's accounts have been decimated as a direct result of Defendant GAMCO's abdication of their obligations to Rioseco, and the failure of Defendants to investigate numerous red flags indicating extreme risk to Rioseco from concentrating investment exposure in Madoff for a substantial portion of Rioseco's assets.

32.     Given Rioseco's age, his repeated expressed desire to place his retirement assets in safer investments, and his decreased ability to earn substantial income going forward, Defendant GAMCO had an affirmative obligation to ensure that Rioseco's account was properly invested, to keep informed regarding changes in the market, and to act to protect Rioseco's interests.  Moreover, given Rioseco's personal and financial situation and lack of experience investing in alternative investments, the Manhattan Partners and S.W.A.N. investments were unsuitable, as was the heavy concentration of the remainder of Rioseco's assets in equities, which exposed him to substantial market risk.

33.     Defendant GAMCO abrogated its fiduciary responsibilities to Rioseco by ceding to Madoff unfettered discretionary authority over Rioseco's account and allowing complete and unfettered custody of Rioseco's funds to Madoff, with no specific oversight over Madoff or the manner in which he invested funds placed under his control.

34.     Defendant GAMCO never informed Rioseco of the inherent riskiness of concentrating such a large percentage of retirement assets with a single manager, including the risk that in the event of a regulatory or other legal problems at Madoff's firms, Rioseco could lose a substantial portion of his retirement assets.

35.     During the period from November 2007 through October 2008, Rioseco repeatedly expressed his growing concern over the state of his investment portfolio to Defendant GAMCO, seeking its advice as to how to more conservatively invest his assets.  At times, Defendant GAMCO simply failed to heed Rioseco's concerns.  At other times, Defendant GAMCO failed to return Rioseco's telephone calls and, on at least one occasion, Gabelli failed to show up for a scheduled meeting.  During the same period, the securities markets experienced severe volatility and declines. Yet, notwithstanding these market-wide issues, including the demise of Lehman Brothers, Bear Stearns, and many other firms, the widely-reported issues with AIG and other financial services firms, the federal bailout and growing unease in the economy and the capital markets, Defendant GAMCO failed to satisfy their ongoing suitability and other obligations to Rioseco, by failing to safeguard his assets.  The Manhattan Partners and S.W.A.N. investments were unsuitable when made, and they became more and more unsuitable as time passed, while Rioseco grew older, his ability to earn substantial income in his dental practice decreased, and the capital markets grew more and more volatile and unstable.  Moreover, the overconcentration of Rioseco's assets in equities was blatantly unsuitable, given Rioseco's expressed desire to place his account in a more conservative posture.

### THE BERNARD MADOFF SCANDAL

36.     On December 10, 2008, Madoff reportedly informed certain senior employees at his investment firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"), that his investment advisory business was a fraud.  Madoff reportedly stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme."  Madoff reportedly communicated to the senior employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors.

Madoff reportedly stated that the business was insolvent, and that it had been for years.  Madoff also reportedly stated that he estimated the losses from this fraud to be approximately $50 billion.

37.     On December 11, 2008, the SEC charged Madoff and BMIS with securities fraud for a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on advisory clients of BMIS. Also on December 11, 2008, Madoff and BMIS were criminally charged by the United States Attorney's Office of the Southern District of New York with securities fraud.  According to the SEC's complaint and the U.S. Attorney's criminal complaint, since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS. The United States District Court for the Southern District of New York has appointed a receiver to oversee his firm BMIS.

38.     In the wake of this debacle, Rioseco contacted Gabelli concerning whether his limited partnership interests were presently invested in funds managed by Madoff.  Respondent Gabelli again acknowledged during these conversations that Rioseco's Manhattan Partners and S.W.A.N.'s assets were invested, through feeder vehicles, in funds managed by Madoff.  As a result, Rioseco reasonably believes that his investments in Manhattan Partners and S.W.A.N. have been severely damaged, if not wiped out entirely.

39.     The recommendation to continue to concentrate such a large percentage of assets with Madoff is particularly egregious, given the number of growing red flags in the marketplace regarding Madoff and his investment strategy in recent years.  Indeed, many sophisticated fund managers refused to invest their clients' funds with Madoff because they, unlike Defendant GAMCO, conducted adequate due diligence into Madoff and his firm.  Prior to disclosure of the fraud, investment advisory firm Aksia concluded, among other things, that the stock holdings reported in the quarterly statements of BMIS filed with SEC appeared too small to support the size

of the assets Madoff claimed to be managing.  Aksia sent a letter to its clients after the Madoff

scandal broke stating that for years it had steered its clients away from Madoff:

- The Madoff feeder funds marketed a purported "Split-strike Conversion" strategy that is remarkably simple; however, its returns could not be nearly replicated by our quant analyst.

- It seemed implausible that the S&P 100 options market that Madoff purported to trade could handle the size of the combined feeder funds' assets which we estimated to be $13 billion.

- The feeder funds had recognized administrators and auditors but substantially all of the assets were custodied with Madoff Securities. This necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz (not a fictitious audit firm). After some investigating, we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff's activities.

- There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities. The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

- Madoff's website claimed that the firm was technologically advanced ("the clearing and settlement process is rooted in advanced technology") and the feeder managers claimed 100% transparency. But when we asked to see the transparency during our onsite visits, we were shown paper tickets that were sent via U.S. mail daily to the managers. The managers had no demonstrated electronic access to their funds accounts at Madoff. Paper copies provide a hedge fund manager with the end of the day ability to manufacture trade tickets that confirm the investment results.

- Conversations with former employees indicated a high degree of secrecy surrounding the trading of these feeder fund accounts. Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm.

Aksia is consistently negative on firms where key and control positions are held by family members.

• Madoff Securities, through discretionary brokerage agreements, initiated trades in the accounts, executed the trades, and custodied and administered the assets. This seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags.

40.    Similarly, on December 18, 2008, *The Wall Street Journal* reported that certain investment firms throughout Wall Street were convinced as early as 2005 that Madoff's firm was a fraud, even going so far as to call it a Ponzi scheme.  In a letter dated November 7, 2005 from Harry Markopolos to the Securities and Exchange Commission, the SEC was advised of the suspicions of Markopolos (and others on Wall Street) that Madoff was a fraud.  This letter states:

I am the original source of the information presented herein having first presented my rationale, both verbally and in writing, to the SEC's Boston office in May, 1999 before any public information doubting Madoff Investment Securities, LLC appeared in the press. There was no whistleblower or insider involved in compiling this report.  I used the Mosaic Theory to assemble my set of observations. My observations were collected first-hand by listening to fund of fund investors talk about their investments in a hedge fund run by Madoff Investment Securities, LLC, a SEC registered firm.  I have also spoken to the heads of various Wall Street equity derivative trading desks and every single one of the senior managers I spoke with told me that Bernie Madoff was a fraud.

\*        \*        \*

I have outlined a detailed set of Red Flags that made me very suspicious that Bernie Madoff's returns aren't real and, if they are real, then they would almost certainly have to be generated by front-running customer order flow from the broker-dealer arm of Madoff Investment Securities, LLC.

\*        \*        \*

Scenario #2 (**Highly likely**) Madoff Securities is the world's largest Ponzi Scheme.  In this case there is no SEC reward payment due the whistle-blower so basically I'm turning this case in because it's the

right thing to do.  Far better that the SEC is proactive in shutting
down a Ponzi Scheme of this size rather than reactive.

41.      The letter goes on to identify numerous red flags, from publicly available

information, that Madoff was engaged in fraud, including questions concerning:

- the unusual manner in which Madoff structured his business operations;

- the fact that Madoff's firms were funding their operations at extremely high interest rates when cheaper money was available in short term credit markets;

- the fact that Madoff operated his firm with an extraordinary level of secrecy;

- Madoff's strategy could not possibly deliver the returns Madoff was boasting;

- The counter-party credit exposure necessary to support Madoff's alleged strategy would be too large for UBS and Merrill Lynch to handle; and

- In addition to discussions Markopolos had with various Wall Street equity derivative traders (all of whom believed Madoff was a fraud), certain press articles doubted the validity of Madoff's returns.

42.      Robert Rosenkranz, the principal of a major investment advisor to wealthy clients,

Acorn Partners, was reported in the financial press to have stated that his firm's earlier due

diligence of the Madoff firm, based in part on the abnormally stable and high investment returns

claimed by Madoff and in part on inconsistencies between customer account statements and audited

BMIS financial statements filed with the SEC, caused Acorn to conclude that it was highly likely

that the BMIS account statements were generated as part of a fraudulent scheme.

43.      Defendant GAMCO abdicated responsibility of the management of a substantial

portion of Rioseco's assets to Madoff, and recklessly, with gross negligence and in breach of their

fiduciary obligations, failed to perform or cause to be performed appropriate due diligence that

would have revealed material irregularities in the investments, operations and financial reporting of

Madoff and his firms.

44.     Defendant GAMCO either knew of or recklessly disregarded: (a) the very high concentration of Rioseco's investments in a single third party investment manager, and the materially heightened risk to Rioseco's assets from such reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (b) the abnormally high and stable positive investment results reportedly obtained by Madoff; (c) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients; and (d) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County New York and had no experience auditing entities of the apparent size and complexity of BMIS.

### GAMCO'S MISSTATEMENTS, DECEIT AND MATERIAL OMISSIONS

45.     Plaintiffs and the absent class members' asset management agreements with Defendant provided that they would pay GAMCO an "advisory fee" which was "in consideration of its services as investment advisor." This statement was false and materially misleading. John Gabelli admits that with respect to his advice to turn over all of the Manhattan Partners B and S.W.A.N. funds to another fund run by Sandra Manzke which, in turn, charged an advisory fee and then turned over the funds to BMIS, the payment of the "advisory fee" was not for advice, rather it was for "access" to BMIS. GAMCO did not serve as an investment advisor with respect to any funds it placed in control of BMIS - it simply charged a fee for "access", over and above the fees also charged by Sandra Manzke's firm for the same lack of due diligence that firm did of Mr. Madoff's operations.

46.     Plaintiffs and the absent class members' asset management agreements with GAMCO further provided that "GAMCO will attempt to resolve any conflicts of interest by exercising the good faith required of fiduciaries, and GAMCO believes that it will be able to resolve conflicts on an equitable basis." This statement was false and materially misleading. John

Gabelli, his wife, Carol Gabelli, and Daniel Lofrese had personal financial interests in placing Plaintiffs and the absent class members' funds in the Manhattan Partners' and S.W.A.N. limited partnerships.  Their interest in obtaining monies by serving as general partners of these partnerships conflicted with their duties as fiduciaries to Plaintiffs and the absent members of the class. Notwithstanding its contractual pledge, GAMCO made no effort whatsoever to resolve these conflicts by exercising the good faith required of fiduciaries.  Instead of placing the interests of Plaintiffs and the absent members of the class ahead of the financial interest of their employees, GAMCO failed to exercise any good faith by failing to conduct any diligence of BMIS, failing to investigate the nature of the investments and failing to even know where the assets were custodied.

47.     Plaintiffs and the absent class members' asset management agreements with GAMCO also stated that "GAMCO normally holds on behalf of its clients positions of more than 5% of the equity securities of several issuers.  With respect to the limited partnership funds ultimately managed by BMIS, this statement was materially misleading and omitted information concerning the true nature of the investments BMIS supposedly held.

48.     With respect to Plaintiffs and the absent class members' investments in the Manhattan Partners limited partnerships, GAMCO provided Plaintiffs and the absent class members' investment materials including a document entitled "Manhattan Partners I, L.P. Class B - Brief Summary of the Offering Memorandum."  This document was rife with misstatements.  For example, this document explains that "Manhattan Partners Class B investors will be invested with one of Manhattan Partner's investment managers.  This manager utilizes a relatively market neutral approach."  This manager was BMIS.  BMIS did not use a market neutral approach and GAMCO had no basis in fact to state that he did as it had done no due diligence of BMIS' operations.

49.     Further untruths included statements concerning the investment philosophy of the

Class B shares.  The Summary document stated that:

> The **Class B** manager seeks to obtain capital appreciation by utilizing
> a nontraditional options trading strategy which can be described as a
> "split strike synthetic conversion" strategy. . . . A proprietary
> computer system continually optimizes this small basket of stocks to
> replicate and enhance the performance of the S&P 100 at low cost. . .
> . Under normal circumstances the manager is fully hedged using
> options that represent an amount equal to the aggregate value of the
> underlying long securities.

John Gabelli, the GAMCO employee who advised Plaintiffs and the absent class members to invest

in Manhattan Partners,  had no basis at all for any of these statements.  The statements materially

mislead Plaintiffs and the members of the class into believing that BMIS had a legitimate capital

appreciation strategy, a computer system that enhances the portfolio and a risk reduction strategy.

GAMCO negligently failed to investigate whether any of these statements were, in fact, true.  No

GAMCO employee ever had access to any information which would have been necessary to test the

accuracy of the statements made in this offering memorandum.

## OTHER IMPROPRIETIES

50.     Defendants further failed to discharge their continuing and ongoing duties to ensure

that Plaintiffs' investments were appropriate and suitable.  For example, from the period of

December 31, 2007 until October 31, 2008, Rioseco's retirement account value (excluding his

investments in Manhattan Partners and SWAN Partners) diminished from more than $3.8 million to

less than $2.2 million, or approximately 43%.  Further, during the same period, Eva's investment

portfolio diminished from more than $770,000 to less than $372,000, after netting at $145,000 in

distributions, Eva's portfolio declined approximately 41%.  Cruz, an elderly widow,  received

approximately $300,000 from her husband's estate in 1999.  Since the end of 2007, she has lost a

significant amount of that money in investments that, upon information and belief, were almost entirely weighted in risky equity investments.

51.     Given the serious adverse market conditions present in late 2007 and into 2008, a prudent investment advisor would have reduced the risks in Plaintiffs' portfolios.  In the face of such conditions, Defendant GAMCO failed to take reasonable steps to protect Plaintiffs against the adverse consequences of the market downturn. For example, as of December 31, 2007, Defendant GAMCO advised Rioseco to invest his retirement assets in $3,014,367.09 of stocks (98.78% of the non-limited partnership investments in the account) and only $37,062.50 of fixed income vehicles (1.21% of the non-limited partnership investments in the account).   As the market continued to deteriorate in 2008, this ratio became even worse.  As of May 31, 2008, Defendant GAMCO advised Rioseco to invest his retirement assets in $3,090430.66 of stocks (98.95% of the non-limited partnership investments in the account) and only $32,875 (1.05% of the non-limited partnership investments in the account) of fixed income instruments.  As a result, Rioseco remained exposed to substantial market risk, despite repeatedly expressing to Defendant GAMCO his growing concerns about risk and his desire to have his assets invested more conservatively.

52.     Defendant GAMCO also failed to properly protect and safeguard Rioseco's non-retirement investment account.  As of January 31, 2008, Defendant GAMCO had 96.6% of Defendant GAMCO investment account invested in stocks and 3.34% in cash.  Defendant GAMCO failed to take steps to protect these assets while the markets continued to decline in 2008.  As of August 31, 2008, Defendants had 96.79% of Rioseco's total assets in stocks and 3.21% in cash.

53.     During the period December 31, 2007 until at least October 1, 2008, Defendant GAMCO invested Plaintiffs' accounts heavily in stocks with almost no weighting in safer investments such as bonds, low-yield CDs or money market funds.  Not only should Defendant GAMCO have known that Rioseco, at age 72, his wife Eva, age 74, and his sister, Cruz, a 62-year

old widow with little earning power and limited assets, should have been invested in less risky instruments, Defendant GAMCO was on specific notice that Rioseco and Eva wanted to begin to cycle out of equities into more conservative investments, given the repeated concerns Rioseco expressed over his and his wife's portfolio, beginning in 2002, and escalating substantially in late 2007 into 2008.

54.     At the end of 2007, given the market's gyrations, Rioseco advised Lofrese to keep a substantial amount of his securities portfolio in cash.  Lofrese failed to heed this instruction and reinvested a large portion of this money in securities that lost significant sums.

55.     In January 2009, after receiving her statement, Cruz called Lofrese to ask why her account had lost so much money.  After Cruz reminded him, in tears, that her inheritance was necessary to supplement her living expenses, she asked him what she should do about the precipitous losses in her accounts.  Lofrese, in a stunning recognition of his lack of regard for his fiduciary responsibilities, told her to get a financial advisor.

56.     As a direct consequence of Defendant GAMCO's failure to invest Plaintiffs' assets in suitable investments, Plaintiffs incurred substantial losses.

## CLASS ALLEGATIONS

57.     Plaintiffs bring their claims under the Investment Advisors Act of 1940 only (Count I, *infra*) as representatives of a class of:

> natural persons and individuals who and which were consumers of
> the asset management services of Defendant GAMCO and also were
> invested in limited partnerships or other instruments which were
> managed either directly or indirectly by Bernard Madoff or his
> securities firm Bernard Madoff Investment Securities, LLC or other
> firm controlled by Bernard Madoff (collectively, "Madoff")

58.     The class period spans the entire period that any of the assets of any class member were ultimately managed by Madoff.

59.     The class is so numerous that joinder of all members is impracticable.  According to GAMCO's ADV filed with the SEC on April 28, 2008, three of the funds which were exposed to Madoff had approximately $51 million in assets in them.  These assets were spread among numerous persons and individuals.

60.     There are questions of law and fact that are common to the class including the fiduciary standards governing investment advisors pursuant to the Investment Advisors Act, 15 U.S.C. § 80b-6, the standardized terms of GAMCO's investment advisory agreements and the misleading statements and omissions related to the investment advice GAMCO gave its investment advisory clients who invested in funds that were managed by BMIS.

61.     The claims of the representative parties are typical of the claims of the absent members of the class as Plaintiffs and the absent members of the class were all, at relevant times, investment advisory clients of GAMCO who each entered into standardized investment advisory agreements with GAMCO and were all given the same misleading information about their limited partnership investments and not told the same significant facts concerning such investments.

62.     The representative parties will fairly and adequately protect the interests of the class.

63.     The common questions of law and fact predominate over any questions affecting only individual members and a class action is superior to other available means of adjudicating this action.  Without class certification, individual members of the class will have to present the same proofs over and over again in separate proceedings in order to demonstrate that GAMCO violated the same law in the same way.  This would be a inefficient method of adjudicating these similar claims of violations of the Investment Advisors Act.

## CLAIMS FOR RELIEF

### Count I - Breach of Investment Advisors Act - 15 U.S.C. § 80b-6

64.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

65.     Section 202(a)(11) of the IAA provides in pertinent part:

"Investment adviser" means any person who, for compensation, engages in the business of advising others ... as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . .

15 U.S.C. § 80b-2(a)(11).

66.     Defendant GAMCO was, at all relevant times, an investment advisor to Plaintiffs as Plaintiffs entered into investment advisory contracts with GAMCO and paid Defendant GAMCO a percentage of their assets which were managed by GAMCO.  Defendant GAMCO registered as an investment advisor with the United States Securities and Exchange Commission ("SEC") and filed required Form ADVs with the SEC.

67.     Defendant GAMCO engaged in transactions,  practices and a course of business that operated as a fraud and deceit on Plaintiffs and which is considered manipulative.  Further, by virtue of its investment of Rioseco's funds in Manhattan Partners and S.W.A.N., GAMCO failed to discharge its duty that its investment advice be disinterested.  GAMCO principals and Gabelli and Lofrese had, at all relevant times, interest in Manhattan Partners and S.W.A.N.

68.     Defendant GAMCO used the United States mail in connection with its course of business with Plaintiffs.

69.     Under Section 215 of the IAA, as a result of the violations of the IAA, Plaintiffs are entitled to rescind their investment advisory contracts with Defendant GAMCO and restitution of all monies they paid to Defendant GAMCO as investment advisory fees.

### Count II – Breach of Fiduciary Duty

70.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

71.     By virtue of their discretionary authority over Plaintiffs' accounts, Defendant

GAMCO owes continuing fiduciary duties of care, loyalty, candor and good faith directly to

Plaintiffs.  Defendant GAMCO has breached those fiduciary duties in the manner set forth herein.

72.     Defendant GAMCO intentionally or acting with gross negligence and recklessness,

and contrary to industry customs, practices and standards, failed to comply with its fiduciary duties

by:

   (a)    failing to conduct adequate due diligence into the sub-
          advisor handling Plaintiffs' assets;

   (b)    failing to uncover and/or alert Plaintiffs to the
          numerous red flags which Defendant GAMCO should
          have discovered about the sub-advisor handling
          Plaintiffs' assets;

   (c)    failing to protect and safeguard Plaintiffs' assets by
          allowing the funds to be custodied with Madoff,
          despite the clear conflicts of interest involved in that
          arrangement;

   (d)    failing to protect and safeguard Plaintiffs' funds by
          allowing the funds to be over-exposed to declines in
          the market and failing to place the accounts in a
          defensive posture even after Rioseco expressed his
          continued uneasiness over the markets in 2007 and
          2008;

   (e)    trading Plaintiffs' accounts in total disregard of his
          investment objectives, financial limitations, and his
          specific authorizations and instructions, and
          misrepresentations or omissions relating thereto; and

   (f)    initiating an overall strategy without reasonable
          grounds to expect achievement of Plaintiffs'
          investment objectives and by failing to reveal the risks
          inherent in such transactions and strategies, and
          misrepresentations or omissions relating thereto.

73.     By virtue of the above, Defendant GAMCO breached its fiduciary and other legal

duties to provide competent, professional services according to rules and regulations of FINRA and

industry customs, practices and standards, and duties of good faith and fair dealing owed to Plaintiffs.

74.    By virtue of the foregoing, Plaintiffs have been damaged and are entitled to recover from Defendant GAMCO an amount to be proved at the hearing of this matter representing the damages incurred as a result of the activity complained of above.

### Count III – Unsuitability of Investments

75.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

76.    The unsuitability doctrine provides, in pertinent part:

(a)    In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b)    Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

(1)    the customer's financial status;

(2)    the customer's tax status;

(3)    the customer's investment objectives; and

(4)    such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer

77.     Defendant GAMCO invested Plaintiffs' assets in unsuitable investment vehicles, failed to conduct adequate due diligence on the sub-advisor, Madoff, and failed to protect and safeguard the portfolio from the possibility of severe market declines.  This Rule prohibits investment advisors from making investment recommendations that are unsuitable to their clients' investment objectives, financial situation and risk tolerance.  In determining suitability, an advisor should not only investigate the individual securities recommended in light of the client's investment experience, level of sophistication, investment objectives, financial situation, and tolerance for risk, but should also take into account the overall trading strategy employed by the broker in the handling of the account in light of these considerations as well.

78.     Moreover, suitability is an ongoing and continuing obligation of the advisor, and as a client's situation and risk tolerance changes over time, the advisor is obligated to constantly review the suitability of a customer's investments, and to take affirmative steps to respond to a client's situation and protect a client's assets.

79.     By virtue of the foregoing, Plaintiffs have been damaged and is entitled to recover from Defendants an amount to be proved at the hearing of this matter representing the damages incurred as a result of the activity complained of above.

**Count IV - Common Law Fraud**

80.     Plaintiff Rioseco repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

81.     Defendant GAMCO recklessly failed to appreciate that the limited partnership investments managed by Madoff were risky investments which were not suitable for Plaintiff Rioseco, and recklessly failed to conduct adequate due diligence on Madoff and his firms. Defendants recklessly failed to keep Plaintiff apprised of increasing risks in his investment portfolio.

82.     Defendant GAMCO has misrepresented to Plaintiff Rioseco the true nature of the limited partnership investments they sold to Plaintiff Rioseco.  Defendant GAMCO represented that the limited partnership investments were safe investments, but Defendant GAMCO failed to disclose the risks inherent in overconcentrating Plaintiff Rioseco's retirement assets with Madoff, as described herein.  Defendant GAMCO also failed to disclose that they failed to conduct adequate and appropriate due diligence on Madoff and his operations.

83.     Those representations were materially false in that the investments were much riskier than Defendant GAMCO portrayed them to be, as described herein.

84.     Plaintiff Rioseco reasonably relied upon the veracity of Defendant GAMCO regarding the limited partnership investments.

85.     By virtue of the foregoing, Plaintiff Rioseco has been damaged and is entitled to recover from Defendant GAMCO an amount to be proved at the hearing of this matter representing the damages incurred as a result of the activity complained of above.

## Count V – Negligence and Gross Negligence

86.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

87.     By virtue of the foregoing, Defendant GAMCO breached its duty to exercise reasonable care, competence and diligence in the management of Plaintiffs' accounts and to act in a manner consistent with industry customs, practice and standards.

88.     As a direct and proximate result of the negligence and gross negligence of Defendant GAMCO, Plaintiffs suffered significant monetary loss.

89.     By virtue of the foregoing, Plaintiffs have been damaged and are entitled to recover from Defendant GAMCO an amount to be proved at the hearing of this matter representing the damages incurred as a result of the activity complained of above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of similarly situated investment

advisory clients of GAMCO,  pray for judgment as follows:

(a)    rescission of their investment advisory contracts and restitution of all monies paid as investment advisor fees;

(b)    rescissory or compensatory damages for the out-of-pocket losses suffered in an amount to be established at trial;

(c)    consequential damages, in an amount to be proven at trial;

(d)    punitive damages to punish Defendant GAMCO for its willful misconduct and flagrant violations of their obligations to Plaintiffs, so as to set an example and to deter such behavior in the future;

(e)    the costs of litigation, including reasonable consulting and representation fees, expert witness fees and any other costs deemed reasonable; and

(f)    any other damages or other relief deemed just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by

jury of all issues so triable.

Dated: April 1, 2010                     LOWEY DANNENBERG COHEN & HART, P.C.


By:    **/s/ Peter D. St. Phillip, Jr.**
       Peter D. St. Phillip, Jr. (PS-0726)
       Thomas M. Skelton (TS-7908)
       White Plains Plaza
       One North Broadway, Suite 509
       White Plains, New York 10601
       Telephone:  (914) 997-0500
       Facsimile:   (914) 997-0035

       ***Attorneys for Plaintiffs, George L. Rioseco,
       Eva Rioseco, Nilda Cruz and the Class***